## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL CANTRELL, derivatively on behalf of UNITED STATES OIL FUND, LP, <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES COMMODITY FUNDS LLC, JOHN P. LOVE, STUART P. CRUMBAUGH, ANDREW F. NGIM, GORDON L. ELLIS, MALCOLM R. FOBES III, NICHOLAS D. GERBER, ROBERT L. NGUYEN, and PETER M. ROBINSON, <br><br> Defendants, <br><br> and <br><br> UNITED STATES OIL FUND, LP, <br><br> Nominal Defendant. | Case No.: 1:20-cv-6974 <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Michael Cantrell ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant United States Oil Fund, LP ("USO" or the "Company"), files this Verified Shareholder Derivative Complaint against John P. Love, Stuart P. Crumbaugh, Andrew F. Ngim, Gordon L. Ellis, Malcolm R. Fobes III, Nicholas D. Gerber, Robert L. Nguyen, and Peter M. Robinson (collectively, the "Individual Defendants"), and United States Commodity Funds LLC ("USCF" or the "General Partner," and together with the Individual Defendants, the "Defendants") for breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D

of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of USO's public documents, conference calls and announcements made by Defendants and USO, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding USO, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by USCF and its officers and directors that caused damage to USO between February 25, 2020 and April 28, 2020, both dates inclusive (the "Relevant Period").

2.      USO is a California-based exchange-traded fund that invests in futures contracts for light, sweet crude oil and other petroleum-based fuels. The Company is organized as a Delaware limited partnership, and is operated by the Company's general partner, USCF, which manages, directs, and controls all of USO's activities. According to the Company's SEC filings, USO does not have officers or directors—rather, it is managed by the Board of Directors (the "Board") and executive officers of the General Partner.

3.      The Company's business consists of tracking the price of, and investing in, West Texas Intermediate ("WTI") light, sweet crude oil delivered to Cushing, Oklahoma. Prior to, and during the Relevant Period, the Company purported that it would achieve its investment objectives by investing virtually all of its assets in near month WTI futures contracts, i.e., the contracts for WTI crude oil with the shortest time to maturity.

4.      Beginning in early 2020, however, a number of cataclysmic market trends began bearing down upon the oil market and the Company, which made the Company's stated investment objectives all but unattainable. These factors included (1) the widespread lockdowns and halting of business operations across the globe in response to the ongoing COVID-19 pandemic; (2) the commencement of an oil price war in early March 2020 between Saudi Arabia and Russia, causing a decline in oil prices and a spike in supply; (3) an ensuing shortage of available space in oil storage facilities in Cushing, resulting in a rare phenomenon called "super contango," whereby the futures price of oil (the price of oil at certain later dates) significantly exceeded the spot price (the current price of oil); and (4) significant liquidity constraints caused by the concurrent influx of millions of dollars into the Company by retail investors in an attempt to capitalize on the lowered price of oil, which investors predicted would likely begin to rebound once COVID-19 shutdowns ended and the Russia-Saudi Arabia price war waned.

5.      In March 2020, Defendants caused the Company to initiate an enormous offering of over $2.4 billion worth of Company shares to the market, which was made effective by way of a Registration Statement on Form S-3 filed with the SEC on March 19, 2020 (the "March Registration Statement"). However, despite being acutely aware of the above-described market forces that were *already* impacting the Company and its ability to meet its stated investment goals, the Defendants failed to include any mention of such developments in the March Registration Statement, providing only a boilerplate list of risk factors that were substantially unchanged from previous registration statements filed by the Company. Moreover, the offering itself actually exacerbated the impact of certain of the risks the Defendants had failed to disclose to the public, including by causing the Company to approach position and accountability limits in the WTI futures market.

6.      The truth as to the Company's prospects emerged gradually over the course of the next month. Throughout April 2020, in piecemeal fashion, the Company repeatedly disclosed various alterations to its investment strategy, and made belated disclosures regarding certain of the unfavorable market trends affecting the Company and its prospects. By the end of the month, USO had essentially transformed from the well-performing, passive fund described in the March Registration Statement to a struggling, actively managed fund focused on purchasing crude oil contracts that expire further out in the future, an investment strategy starkly different from the one Defendants had previously described to the public.

7.      Finally, on April 28, 2020, the Company shocked the market by revealing that USO had suffered roughly $1.2 billion in losses during the month of March 2020. On this news, the price of the Company's stock dropped from $2.19 per share at the close of trading on April 27, 2020, to $2.13 per share at the close of trading on April 28, 2020, adjusted for a reverse stock split implemented by the Company that same day. In total, the price of the Company's stock declined by nearly 80% over the course of the Relevant Period.

8.      Then, in late May 2020, news outlets reported that both the SEC and the Commodity Futures Trading Commission had begun investigating the Company in connection with Defendants' false and misleading representations to the investing public.

9.      Not long after, in August 2020, the Company disclosed that it had received a "Wells Notice" from the SEC indicating that SEC staff had recommended that the SEC file an enforcement action against USO, USCF, and the Company's President and Chief Executive Officer ("CEO"), Defendant John P. Love ("Love") relating to "USO's disclosures in late April and early May regarding constraints imposed on USO's ability to invest in Oil Futures Contracts."

10.     During the Relevant Period, the General Partner and the Individual Defendants breached their fiduciary duties to USO by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) The Company's oil investments were being heavily impacted by the COVID-19 pandemic, an ongoing oil price war, super contango, and issues with the Company's liquidity, among other things; (2) as a result, the Company's risk profile had been radically altered, and the Company would no longer be able to achieve its stated objectives in the market or adhere to the investment strategy Defendants had touted to investors; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The General Partner and the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.     Additionally, in breach of their fiduciary duties, the General Partner and the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

13.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the General Partner and the Individual Defendants caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

Approximately 10.7 million shares of the Company's common stock were repurchased during the Relevant Period. As the Company's stock was actually only worth $2.13 per share during that time, the price at closing on April 28, 2020, the Company overpaid by over $40 million in total.

14.     The General Partner and the Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the General Partner, the General Partner's President and CEO, and the General Partner's Chief Financial Officer ("CFO") to three federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, including through overpayment for stock through repurchases, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by USCF and its Board, which also serves as the Company's board of directors, of the substantial likelihood of USCF's liability in this derivative action and in the Securities Class Actions, and of USCF not being disinterested and/or independent, USCF cannot consider a demand to commence litigation against itself and its officers and directors on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal

question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of USO. Plaintiff has continuously held USO common stock since before the beginning of the Relevant Period. Plaintiff is a citizen of North Carolina.

### Nominal Defendant USO

22.     USO is a Delaware limited partnership with its principal executive offices located at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596. USO's shares trade on the New York Stock Exchange ("NYSE") Arca under the ticker symbol "USO."

### Defendant USCF

23.     USCF is a Delaware limited liability company with its principal executive offices located at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596. USCF is the general partner of USO.

24.     USCF and USO's relationship is governed by USO's Limited Partnership Agreement. Per the Limited Partnership Agreement, the General Partner conducts, directs and manages all activities of USO. All management powers over the business and affairs of the Company are exclusively vested in the General Partner.

**Defendant Love**

25.     Defendant Love has served as USCF's President and CEO since May 2015, as a director of USCF since October 2016, and as Chairman of the Board of USCF since October 2019.

26.     The Company's annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K") stated the following about Defendant Love:

*John P. Love*, 48, President and Chief Executive Officer of USCF since May 15, 2015, Management Director of USCF since October 2016 and Chairman of the Board of Directors of USCF since October 2019. Mr. Love previously served as a Senior Portfolio Manager for the Related Public Funds from March 2010 through May 15, 2015. Prior to that, while still at USCF, he was a Portfolio Manager beginning with the launch of USO in April 2006. Mr. Love was the portfolio manager of USO from April 2006 until March 2010 and the portfolio manager for USL from December 2007 until March 2010. Mr. Love has been the portfolio manager of UNG since April 2007, and the portfolio manager of UGA, UHN, and UNL since March 2010. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Love has served as on the Board of Managers of USCF Advisers since November 2016 and as its President since June 18, 2015. He also acted as co-portfolio manager of the Stock Split Index Fund, a series of the USCF ETF Trust for the period from September 2014 to December 2015, when he was promoted to the position of President and Chief Executive Officer of the USCF ETF Trust. Since October 2016 to present, he also has served as the President and Chief Executive of the USCF Mutual Funds Trust. Mr. Love also is a director of Wainwright, a position he has held since December 2016. Mr. Love has been a principal of USCF listed with the CFTC and NFA since January 17, 2006. Mr. Love has been registered as an associated person of USCF since February 2015 and from December 1, 2005 to

April 16, 2009. Mr. Love has also been registered as a branch manager of USCF since March 2016. Additionally, Mr. Love has been approved as an NFA swaps associated person since February 2015. Mr. Love is a principal of USCF Advisers LLC as of January 2017. Additionally, effective as of February 2017, he is an associated person, swap associated person, and branch manager of USCF Advisers. Mr. Love earned a B.A. from the University of Southern California, holds an NFA Series 3 and FINRA Series 7 registrations and is a CFA Charterholder.

27.     Upon information and belief, Defendant Love is a resident of California.

**Defendant Crumbaugh**

28.     Defendant Stuart P. Crumbaugh ("Crumbaugh") has served as USCF's CFO, Secretary, and Treasurer since May 2015.

29.     The Company's 2019 10-K stated the following about Defendant Crumbaugh:

***Stuart P. Crumbaugh***, 56, Chief Financial Officer, Secretary and Treasurer of USCF since May 2015 and also the Chief Financial Officer of Concierge Technologies, Inc., the parent of Wainwright Holdings, Inc. ("Wainwright") since December 2017. In addition, Mr. Crumbaugh has served as a director of Wainwright, the parent and sole member of USCF, since December 2016. Mr. Crumbaugh has been a principal of USCF listed with the CFTC and NFA since July 1, 2015 and, as of January 2017, he is a principal of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Since June 2015, Mr. Crumbaugh has been the Treasurer and Secretary of USCF Advisers. He has served as a Management Trustee, Chief Financial Officer and Treasurer of (1) USCF ETF Trust since May 2015 and (2) USCF Mutual Funds Trust since October 2016. Mr. Crumbaugh joined USCF as the Assistant Chief Financial Officer on April 6, 2015. Prior to joining USCF, Mr. Crumbaugh was the Vice President Finance and Chief Financial Officer of Sikka Software Corporation, a software service healthcare company providing optimization software and data solutions from April 2014 to April 6, 2015. Mr. Crumbaugh served as a consultant providing technical accounting, IPO readiness and M&A consulting services to various early stage companies with the Connor Group, a technical accounting consulting firm, for the periods of January 2014 through March 2014; October 2012 through November 2012; and January 2011 through February 2011. From December 2012 through December 2013, Mr. Crumbaugh was Vice President, Corporate Controller and Treasurer of Auction.com, LLC, a residential and commercial real estate online auction company. From March 2011 through September 2012, Mr. Crumbaugh was Chief Financial Officer of IP Infusion Inc., a technology company providing network routing and switching software enabling software-defined networking solutions for major mobile carriers and network infrastructure providers. Mr.

Crumbaugh earned a B.A. in Accounting and Business Administration from Michigan State University in 1987 and is a Certified Public Accountant – Michigan (inactive).

30.     Upon information and belief, Defendant Crumbaugh is a resident of California.

**Defendant Ngim**

31.     Defendant Andrew F. Ngim ("Ngim") is a co-founder of USCF, and has served as the Chief Operating Officer ("COO") of USCF since August 2016, and as a director of USCF since May 2005.

32.     The Company's 2019 10-K stated the following about Defendant Ngim:

*Andrew F Ngim,* 59, co-founded USCF in 2005 and has served as a Management Director since May 2005 and, since August 15, 2016, has served as the Chief Operating Officer of USCF. Mr. Ngim has served as the portfolio manager for USCI, CPER and USAG since January 2013. Mr. Ngim also served as USCF's Treasurer from June 2005 to February 2012. In addition, he has been on the Board of Managers and has served as the Assistant Secretary and Assistant Treasurer of USCF Advisers since its inception in June 2013. Prior to and concurrent with his services to USCF and USCF Advisers, from January 1999 to January 2013, Mr. Ngim served as a Managing Director for Ameristock Corporation, a California-based investment adviser, which he co-founded in March 1995, and was Co-Portfolio Manager of Ameristock Mutual Fund, Inc. from January 2000 to January 2013. Mr. Ngim also served as portfolio manager of (1) the Stock Split Index Fund from September 2014 to October 2017, and (2) the USCF Restaurant Leaders Fund from November 2016 to October 2017, both series of the USCF ETF Trust. Mr. Ngim also serves as the portfolio manager for three funds that are series of the USCF ETF Trust: (1) USCF SummerHaven SHPEI Index Fund from December 2017 to present, (2) USCF SummerHaven SHPEN Index Fund also from December 2017 to present, and (3) USCF SummerHaven Dynamic Commodity Strategy No K-1 Fund from May 2018 to present. Mr. Ngim serves as a Management Trustee of: (1) the USCF ETF Trust from August 2014 to the present and (2) the USCF Mutual Funds Trust from October 2016 to present. Mr. Ngim has been a principal of USCF listed with the CFTC and NFA since November 2005 and a principal of USCF Advisers LLC since January 2017. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940 and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Ngim earned his B.A. from the University of California at Berkeley.

33.     Upon information and belief, Defendant Ngim is a resident of California.

**Defendant Ellis**

34.     Defendant Gordon L. Ellis ("Ellis") has served as a director of USCF since September 2005. He also serves as a member of USCF's Audit Committee.

35.     For the fiscal year ended December 31, 2019, Defendant Ellis received $62,926 in compensation from USCF, which consisted entirely of fees earned or paid in cash.

36.     The Company's 2019 10-K stated the following about Defendant Ellis:

**Gordon L. Ellis**, 73, Independent Director of USCF since September 2005. Previously, Mr. Ellis was a founder of International Absorbents, Inc., Director and Chairman since July 1985 and July 1988, respectively, and Chief Executive Officer and President since November 1996. He also served as Chairman of Absorption Corp., a wholly-owned subsidiary of International Absorbents, Inc., which is a leading developer and producer of environmentally friendly pet care and industrial products, from May July 1985 until July 2010 when it was sold to Kinderhook Industries, a private investment banking firm and remained as a director until March 2013 when Absorption Corp was sold again to J. Rettenmaier & Söhne Group, a German manufacturing firm. Concurrent with that, he founded and has served as Chairman from November 2010 to present of Lupaka Gold Corp., a firm that acquires, explores, develops, and evaluates gold mining properties in Peru, South America. Mr. Ellis has his Chartered Directors designation from The Director's College (a joint venture of McMaster University and The Conference Board of Canada). He has been a principal of USCF listed with the CFTC and NFA since November 2005. Mr. Ellis is an engineer and earned an MBA in international finance.

37.     Upon information and belief, Defendant Ellis is a resident of Canada.

**Defendant Fobes**

38.     Defendant Malcolm R. Fobes III ("Fobes") has served as a director of USCF since September 2005. He also serves as the Chair of USCF's Audit Committee.

39.     For the fiscal year ended December 31, 2019, Defendant Fobes received $75,512 in compensation from USCF, which consisted entirely of fees earned or paid in cash.

40.     The Company's 2019 10-K stated the following about Defendant Fobes:

**Malcolm R. Fobes III,** 55, Independent Director of USCF and Chairman of USCF's audit committee since September 2005. He founded and is the Chairman and Chief Executive Officer of Berkshire Capital Holdings, Inc., a California-based investment adviser registered under the Investment Advisers Act of 1940 that has been sponsoring and providing portfolio management services to mutual funds

since June 1997. Mr. Fobes serves as Chairman and President of The Berkshire Funds, a mutual fund investment company registered under the Investment Company Act of 1940. Since 1997, Mr. Fobes has also served as portfolio manager of the Berkshire Focus Fund, a mutual fund registered under the Investment Company Act of 1940, which concentrates its investments in the electronic technology industry. He was also contributing editor of Start a Successful Mutual Fund: The Step-by-Step Reference Guide to Make It Happen (JV Books, 1995). Mr. Fobes has been a principal of USCF listed with the CFTC and NFA since November 2005. He earned a B.S. in finance with a minor in economics from San Jose State University in California.

41.     Upon information and belief, Defendant Fobes is a resident of California.

**Defendant Gerber**

42.     Defendant Nicholas D. Gerber ("Gerber") is a co-founder of USCF, and has served as a director of USCF since June 2005, and as a vice president of USCF since May 2015. Previously, he served as the President and CEO of USCF from June 2005 through May 2015 and as Chairman of the Board of USCF from June 2005 through October 2019.

43.     The Company's 2019 10-K stated the following about Defendant Gerber:

*Nicholas D. Gerber,* 57, Vice President since May 15, 2015. Mr. Gerber served as President and Chief Executive Officer of USCF from June 2005 through May 15, 2015 and Chairman of the Board of Directors of USCF from June 2005 through October 2019. Mr. Gerber co-founded USCF in 2005 and prior to that, he co-founded Ameristock Corporation in March 1995, a California-based investment adviser registered under the Investment Advisers Act of 1940 from March 1995 until January 2013. Since January 26, 2015, Mr. Gerber also has served as the Chief Executive Officer, President, and Chairman of the Board of Directors of Concierge Technologies, Inc. ("Concierge"), which is a company publicly traded under the ticker symbol "CNCG." Concierge is the sole shareholder of Wainwright. Mr. Gerber also is the President and a director of Wainwright, a position he has held since March of 2004. From August 1995 to January 2013, Mr. Gerber served as Portfolio Manager of Ameristock Mutual Fund, Inc. On January 11, 2013, the Ameristock Mutual Fund, Inc. merged with and into the Drexel Hamilton Centre American Equity Fund, a series of Drexel Hamilton Mutual Funds. Drexel Hamilton Mutual Funds is not affiliated with Ameristock Corporation, the Ameristock Mutual Fund, Inc. or USCF. Mr. Gerber also has served USCF Advisers on the Board of Managers from June 2013 to present, as the President from June 2013 through June 18, 2015, and as Vice President from June 18, 2015 to present. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, since February 2017, is registered as a commodity pool operator, NFA member and swap firm. He also has served as

Chairman of the Boards of Trustees of USCF ETF Trust since 2014 and USCF Mutual Funds Trust since October 2016, respectively, (USCF ETF Trust and together with USCF Mutual Funds Trust are referred to as the "Trusts") and each of the Trusts are investment companies registered under the Investment Company Act of 1940, as amended. In addition, Mr. Gerber served as the President and Chief Executive Officer of USCF ETF Trust from June 2014 until December 2015. In the above roles, Mr. Gerber has gained extensive experience in evaluating and retaining third-party service providers, including custodians, accountants, transfer agents, and distributors. Mr. Gerber has been a principal of USCF listed with the CFTC and NFA since November 2005, an NFA associate member and associated person of USCF since December 2005 and a Branch Manager of USCF since May 2009. Additionally, effective as of January 2017, he is a principal of USCF Advisers and, effective as of February 2017, he is an associated person, swap associated person, and branch manager of USCF Advisers. Mr. Gerber earned an MBA degree in finance from the University of San Francisco, a B.A. from Skidmore College and holds an NFA Series 3 registration.

44.     Upon information and belief, Defendant Gerber is a resident of California.

**Defendant Nguyen**

45.     Defendant Robert L. Nguyen ("Nguyen") is a co-founder of USCF, and has served

as a director of USCF since July 2015. He previously served as a director of USCF from 2005 until

March 2012.

46.     The Company's 2019 10-K stated the following about Defendant Nguyen:

***Robert L. Nguyen,*** 60, Management Director and principal since July 2015. Mr. Nguyen served on the Board of Wainwright from December 2014 to December 2016. Mr. Nguyen co-founded USCF in 2005 and served as a Management Director until March 2012. Mr. Nguyen was an Investment Manager with Ribera Investment Management, an investment adviser registered under the Investment Advisers Act of 1940, from January 2013 to March 2015. Prior to and concurrent with his services to USCF, from January 2000 to January 2013, Mr. Nguyen served as a Managing Principal for Ameristock Corporation, a California-based investment adviser registered under the Investment Advisers Act of 1940, which he co-founded in March 1995. Mr. Nguyen was a principal of USCF listed with the CFTC and NFA from November 2005 through March 2012 and an associated person of USCF listed with the CFTC and NFA from November 2007 through March 2012. Mr. Nguyen has been a principal of USCF listed with the CFTC and NFA since July 2015 and an associated person of USCF listed with the CFTC and NFA since December 2015. As of February 2017, he also is an associated person of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and

swap firm. Mr. Nguyen earned his B.S. from California State University at Sacramento, and holds NFA Series 3 and FINRA Series 7 registrations.

47.     Upon information and belief, Defendant Nguyen is a resident of California.

**Defendant Robinson**

48.     Defendant Peter M. Robinson ("Robinson") has served as a director of USCF since September 2005. He also serves as a member of USCF's Audit Committee.

49.     For the fiscal year ended December 31, 2019, Defendant Robinson received $62,926 in compensation from USCF, which consisted entirely of fees earned or paid in cash.

50.     The Company's 2019 10-K stated the following about Defendant Robinson:

*Peter M. Robinson,* 62, Independent Director of USCF since September 2005. Mr. Robinson has been a Research Fellow since 1993 with the Hoover Institution, a public policy think tank located on the campus of Stanford University. He authored three books and has been published in the New York Times, Red Herring, and Forbes ASAP and is the editor of Can Congress Be Fixed?: Five Essays on Congressional Reform (Hoover Institution Press, 1995). Mr. Robinson has been a principal of USCF listed with the CFTC and NFA since December 2005. He earned an MBA from the Stanford University Graduate School of Business, graduated from Oxford University in 1982 after studying politics, philosophy, and economics and graduated summa cum laude from Dartmouth College in 1979.

51.     Upon information and belief, Defendant Robinson is a resident of California.

## FIDUCIARY DUTIES OF THE DEFENDANTS

52.     By reason of Defendant USCF's role as the general partner of USO, and by reason of the Individual Defendants' positions as officers, directors, and/or fiduciaries of the General Partner and the Company, and because of their ability to control the business and corporate affairs of USO, Defendant USCF and the Individual Defendants owed USO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage USO in a fair, just, honest, and equitable manner.

53.     The General Partner, and each director and officer of the General Partner owes to USO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets.

54.     The General Partner, as well as the Individual Defendants, because of their positions of control and authority as directors and/or officers of the General Partner, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the General Partner and the officers and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     USCF, by virtue of its role as general partner of the Company, and each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the General Partner, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

57.     As general partner, and senior executive officers and directors of the general partner of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE Arca, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58.     To discharge their duties, the General Partner and the officers and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of the General Partner were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to USCF's Code of Business Conduct and Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how USO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of USO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that USO's operations would comply with all applicable laws and USO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.      At all times relevant hereto, the Individual Defendants were the agents of each other, of the General Partner, and of USO and were at all times acting within the course and scope of such agency.

60.      Because of their advisory, executive, managerial, and directorial positions with the General Partner, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.      The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by USO.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

62.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Defendants caused the Company to conceal the true facts as alleged herein. The Defendants further aided and abetted and assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the General Partner and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

64.     The  Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Defendants collectively and individually took the actions set forth herein.

65.     The General Partner and each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, of the General Partner, and of USO, and was at all times acting within the course and scope of such agency.

## USCF'S CODE OF ETHICS

67.     USCF maintains a Code of Ethics, which applies to USO and to USCF's officer and directors. Specifically, the Code of Ethics provides that "[a]ll officers, directors and employees of the Company are responsible for maintaining this level of integrity and for complying with the policies contained in this Code."

68.     In a section titled, "Public Disclosure," the Code of Ethics states the following:

> We are committed to a policy of full, fair, accurate, timely, and understandable disclosure to shareholders of all material information regarding our business. This policy extends to our filings with the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), the National Futures Association ("NFA"), and to all other public communications. All individuals involved in our regulatory reporting process and in preparing and making public communications regarding our business must take all reasonable steps to comply with this policy.

69.     In a section titled, "Fair Dealing," the Code of Ethics states the following:

> You must endeavor to deal fairly with companies or individuals with whom we do business or come into contact, including fellow employees of the Company and our competitors. You must not take unfair advantage of these or other parties by means of:

- manipulation;

- concealment;

- abuse of privileged information;

- misrepresentation of material facts; or

- any other unfair-dealing practice.

70.    In a section titled, "Protection and Proper Use of Company assets," the Code of Ethics provides that "[o]ur assets are to be used only for legitimate business purposes. You should protect our assets and ensure that they are used efficiently."

71.    In a section titled, "Compliance with Applicable Laws, Rules and Regulations," the Code of Ethics provides that "[e]ach of us has a duty to comply with all laws, rules and regulations that apply to our business."

72.    In a section titled, "Accuracy of Company Records," the Code of Ethics states the following:

> We require honest and accurate recording and reporting of information in order to make responsible business decisions. This includes such data as quality, safety, and personnel records, as well as financial records.

> All financial books, records and accounts must accurately reflect transactions and events, and conform both to required accounting principles and to our system of internal controls. No false or artificial entries may be made.

73.    In violation of the Code of Ethics, the General Partner and the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Ethics, the Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## THE DEFENDANTS' MISCONDUCT

### Background

74.    Headquartered in Walnut Creek, California, USO is an exchange-traded fund that invests in WTI futures contracts for light, sweet crude oil and other petroleum-based fuels. The

Company is organized as a Delaware limited partnership, and is operated by UCSF, the Company's

general partner. USCF manages and directs all of USO's activities, and the officers and directors

of USCF function as the officers and directors of USO.

75.     With respect to USCF's control over the Company's activities, the Company's

2019 10-K stated the following:

> USO has no executive officers or employees. Pursuant to the terms of the LP
> Agreement, USO's affairs are managed by USCF.
>
> The business and affairs of USCF are managed by a board of directors (the
> "Board"), which is comprised of four management directors (the "Management
> Directors"), each of whom are also executive officers or employees of USCF, and
> three independent directors who meet the independent director requirements
> established by the NYSE Arca Equities Rules and the Sarbanes-Oxley Act of 2002.
> The Management Directors have the authority to manage USCF pursuant to the
> terms of the Sixth Amended and Restated Limited Liability Company Agreement
> of USCF, dated as of May 15, 2015 (as amended from time to time, the "LLC
> Agreement"). Through its Management Directors, USCF manages the day-to-day
> operations of USO.

76.     Prior to, and during the Relevant Period, the Company's business primarily

consisted of tracking, and aligning the daily changes in USO's per share net asset value ("NAV")

with the daily changes in the spot price of WTI crude oil delivered to Cushing, Oklahoma. USO

measured these daily changes by reference to, among other things, changes in the price of a given

short-term futures contract for crude oil, labelled the "Benchmark Oil Futures Contract" by the

Company, as traded on the New York Mercantile Exchange.

77.     A futures contract is a contract to buy or sell a certain commodity, such as barrels

of crude oil, at a set price at a specific point in time in the future. Historically, the Company made

use of a common investment tactic whereby the Company "rolled over" its futures contracts

positions, or sold its contract holdings prior to the expiration of such contracts each month, and

used the proceeds to buy its futures contracts for the next month. Prior to the Relevant Period, the

Company invested almost exclusively in near month WTI futures contracts, or those futures contracts that are closest to expiring.

78.     This investment strategy periodically subjected the Company to "backwardation" and "contango," unique market conditions that affect certain futures contracts. Backwardation refers to a situation where futures contracts expiring in a given month trade at a higher price than the contracts set to expire the next month. Contango refers to the opposite phenomenon—namely, a situation where contracts expiring in a given month trade at a lower price than those expiring in the next month. "Super contango" refers to an extreme version of contango, whereby contracts expiring in a given month trade at a significantly lower price than those expiring in the following month. In the event of contango or super contango in the oil futures market, the value of the Company's designated Benchmark Oil Futures Contract would tend to decrease as it nears its expiration date.

### Trends and Forces in Early 2020 Begin Severely Impacting the Market for Oil

79.     With the onset of the COVID-19 pandemic in early 2020, and the imposition of lockdowns, curfews, and other measures designed to halt the spread of the virus by various national and local governments, demand for oil declined steeply across the globe.

80.     The ensuing turmoil in the oil market was compounded by the eruption of a price war between Saudi Arabia and Russia in early March 2020. Specifically, on March 8, 2020, Saudi Arabia reduced the price of its oil exports to the U.S., Europe, and Asia, causing a massive, single-day decline of 25% in the price of WTI crude oil. Following Saudi Arabia's price reductions, both Saudi Arabia and Russia announced that they would be significantly increasing their production of oil, causing the price of crude oil to fall further. As of March 18, 2020, the price of WTI crude oil had fallen below $21 per barrel, its lowest price in 18 years.

81.    Concurrently with the Saudi Arabia-Russia price war, numerous investors, who predicted that the price of oil would eventually resurge as COVID-19 restrictions were gradually eased and the oil price war ended, and who intended to capitalize on such resurgence, began investing millions of dollars into the Company. Indeed, the Company sold over $2.4 billion worth of Company shares to investors in connection with its March 2020 offering, alone. Yet, this massive influx of capital into the Company created position limits and serious liquidity constraints for the Company, especially in light of the presently volatile oil market, which Defendants were well aware of.

82.    Furthermore, the declining price of oil, coupled with rapidly decreasing storage space for barrels of WTI oil in Cushing, due to excess supply of oil, ultimately caused the near month WTI futures contracts to enter into a state of super contango. By March 23, 2020, there was an approximately $2.12 disparity between the near month futures contracts and the next month futures contracts for WTI oil, representing an over 1,500% increase over the disparity that had existed less than a month prior. As a result of the super contango, USO began suffering enormous losses, which would continue into April as the super contango increased in magnitude, and the Company rolled over its futures contracts for more expensive next month contracts.

**Defendants' Duty to Disclose**

83.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to their finances and operations. Specifically, Item 303 of Regulation S-K required Defendants to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

84.     Item 105 of Regulation S-K further provides the following regarding the risk factors that must be included in a company's registration statement:

Where appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. If the risk factor discussion is included in a registration statement, it must immediately follow the summary section.

85.     As such, the Defendants had a duty under Items 303 and 105 of Regulation S-K to disclose the above-described material market trends impacting the Company, including the risks posed by the COVID-19 pandemic, the Russia-Saudi Arabia price war, the Company's liquidity issues, and the effects of the supercontango, as these transactions constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income; (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income; and (iii) significant factors that made investing in the Company speculative or risky.

**False and Misleading Statements**

***February 25, 2020 Prospectus***

86.     On February 25, 2020, the Company filed a prospectus on Form 424B3 with the SEC in connection with the Company's planned March 2020 offering (the "February Prospectus").

In a section describing the various risks facing the Company, the February Prospectus provided a laundry list of generic, boilerplate risk factors, none of which even mentioned the ongoing COVID-19 pandemic. The February Prospectus stated the following, in relevant part:

> The demand for crude oil correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices. Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and other events or conditions that impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil.

* * *

> Other factors that may affect the demand for crude oil and therefore its price, include technological improvements in energy efficiency; seasonal weather patterns, which affect the demand for crude oil associated with heating and cooling; increased competitiveness of alternative energy sources that have so far generally not been competitive with oil without the benefit of government subsidies or mandates; and changes in technology or consumer preferences that alter fuel choices, such as toward alternative fueled vehicles.

* * *

> Crude oil prices also vary depending on a number of factors affecting supply. For example, increased supply from the development of new oil supply sources and technologies to enhance recovery from existing sources tends to reduce crude oil prices to the extent such supply increases are not offset by commensurate growth in demand. Similarly, increases in industry refining or petrochemical manufacturing capacity may impact the supply of crude oil. World oil supply levels can also be affected by factors that reduce available supplies, such as adherence by member countries to the Organization of the Petroleum Exporting Countries ("OPEC") production quotas and the occurrence of wars, hostile actions, natural disasters, disruptions in competitors' operations, or unexpected unavailability of distribution channels that may disrupt supplies. Technological change can also alter the relative costs for companies in the petroleum industry to find, produce, and refine oil and to manufacture petrochemicals, which in turn may affect the supply of and demand for oil.

* * *

USO is not actively managed by conventional methods. Accordingly, *if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract*. USCF will seek to cause the NAV of USO's shares to track the Benchmark Oil Futures Contract during periods in which its price is flat or declining as well as when the price is rising.

(Emphasis added.)

87.     The February Prospectus also described the Company's investment strategy as follows:

> The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of the Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses. The Benchmark Oil Futures Contract is the futures contract on light, sweet crude oil as traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire.

> \* \* \*

> USO seeks to achieve its investment objective by investing primarily in futures contracts for light, sweet crude oil, other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels that are traded on the NYMEX, ICE Futures Europe and ICE Futures U.S. (together, "ICE Futures") or other U.S. and foreign exchanges (collectively, "Oil Futures Contracts") and to a lesser extent, in order to comply with regulatory requirements or in view of market conditions, other oil-related investments such as cash-settled options on Oil Futures Contracts, forward contracts for oil, cleared swap contracts and non-exchange traded ("over-the-counter" or "OTC") transactions that are based on the price of oil, other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing (collectively, "Other Oil-Related Investments"). Market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing. (For convenience and unless otherwise specified, Oil Futures Contracts and Other Oil-Related Investments collectively are referred to as "Oil Interests" in this prospectus.)

***March 19, 2020 Registration Statement***

88.     On March 19, 2020, the Company filed the March Registration Statement with the SEC. The March Registration Statement was signed by Defendants Love, Crumbaugh, Ngim, Ellis, Fobes, Gerber, Nguyen, and Robinson. In its section describing the risks facing the Company, the March Registration Statement listed only boilerplate risk factors that were substantially unchanged from the factors listed in the February Prospectus and in prior registration statements issued by the Company, and which failed to include any mention of the potentially catastrophic market trends that were already bearing down heavily on the Company, including those related to the super contango, the Russia-Saudi Arabia price war, and the Company's liquidity constraints. For instance, the March Registration Statement provided the following risk factor pertaining to events and conditions that "may" impact demand for crude oil, such as the COVID-19 pandemic:

> The demand for crude oil correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices. ***Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, pandemics (e.g. COVID-19) government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil***. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and ***other events or conditions (e.g. pandemics such as COVID-19), that impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil***.

(Emphasis added.)

89.     The March Registration Statement described additional risk factors that *may* impact the crude oil futures market and the Company's performance, such as contango and market volatility, while failing to disclose any of the important developments described herein that were already impacting the market, stating the following:

> Other factors that may affect the demand for crude oil and therefore its price, include technological improvements in energy efficiency; seasonal weather patterns, which affect the demand for crude oil associated with heating and cooling;

increased competitiveness of alternative energy sources that have so far generally not been competitive with oil without the benefit of government subsidies or mandates; and changes in technology or consumer preferences that alter fuel choices, such as toward alternative fueled vehicles.

* * *

Crude oil prices also vary depending on a number of factors affecting supply. For example, increased supply from the development of new oil supply sources and technologies to enhance recovery from existing sources tends to reduce crude oil prices to the extent such supply increases are not offset by commensurate growth in demand. Similarly, increases in industry refining or petrochemical manufacturing capacity may impact the supply of crude oil. World oil supply levels can also be affected by factors that reduce available supplies, such as adherence by member countries to the Organization of the Petroleum Exporting Countries ("OPEC") production quotas and the occurrence of wars, hostile actions, natural disasters, disruptions in competitors' operations, or unexpected unavailability of distribution channels that may disrupt supplies. Technological change can also alter the relative costs for companies in the petroleum industry to find, produce, and refine oil and to manufacture petrochemicals, which in turn may affect the supply of and demand for oil.

* * *

The design of USO's Benchmark Oil Futures Contract is such that every month it begins by using the near month contract to expire until the near month contract is within two weeks of expiration, when, over a four day period, it transitions to the next month contract to expire as its benchmark contract and keeps that contract as its benchmark until it becomes the near month contract and close to expiration. In the event of a crude oil futures market where near month contracts trade at a higher price than next month to expire contracts, a situation described as "backwardation" in the futures market, then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to rise as it approaches expiration. Conversely, in the event of a crude oil futures market where near month contracts trade at a lower price than next month contracts, a situation described as "contango" in the futures market, then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to decline as it approaches expiration. When compared to total return of other price indices, such as the spot price of crude oil, the impact of backwardation and contango may cause the total return of USO's per share NAV to vary significantly. Moreover, absent the impact of rising or falling oil prices, a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return and investors could lose part or all of their investment. See "Additional Information About USO, its Investment Objective and Investments" for a discussion of the potential effects of contango and backwardation.

90.     Despite the above-described market forces that were already seriously affecting the

Company's liquidity, the March Registration Statement claimed that USO's investments remained

highly liquid, stating the following:

> USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking and liquidation of positions in these financial interests and in Other Oil-Related Investments that, in the opinion of USCF, may be readily liquidated with the original counterparty or through a third party assuming the position of USO.

91.     In a section describing the Company's business and strategy, the March

Registration Statement stated the following:

> The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of a specified short-term futures contract on light, sweet crude oil called the "Benchmark Oil Futures Contract," plus interest earned on USO's collateral holdings, less USO's expenses.

* * *

> The Benchmark Oil Futures Contract is the futures contract on light, sweet crude oil as traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire.

> USO seeks to achieve its investment objective by investing primarily in futures contracts for light, sweet crude oil, other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels that are traded on the NYMEX, ICE Futures Europe and ICE Futures U.S. (together, "ICE Futures") or other U.S. and foreign exchanges (collectively, "Oil Futures Contracts") and to a lesser extent, in order to comply with regulatory requirements or in view of market conditions, other oil-related investments such as cash-settled options on Oil Futures Contracts, forward contracts for oil, cleared swap contracts and non-exchange traded ("over-the-counter" or "OTC") transactions that are based on the price of oil, other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing (collectively, "Other Oil-Related Investments"). Market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing. (For convenience and unless otherwise specified, Oil Futures Contracts and Other Oil-Related Investments collectively are referred to as "Oil Interests" in this prospectus.)

* * *

The Benchmark Oil Futures Contract is changed from the near month contract to the next month contract over a four-day period.

92.     The March Registration Statement further provided that the General Partner believed that daily changes in the Company's share price will "closely track the daily changes in USO's per share NAV," and that daily changes in the Company's NAV will "closely track the daily changes in percentage terms in the Benchmark Oil Futures Contract," stating the following:

> In addition, USCF believes that market arbitrage opportunities will cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis. USCF further believes that daily changes in prices of the Benchmark Oil Futures Contract have historically closely tracked the daily changes in spot prices of light, sweet crude oil. ***USCF believes that the net effect of these relationships will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track, the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses.***

> * * *

> Investors should be aware that USO's investment objective is not for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, nor is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period greater than one day. This is because natural market forces called contango and backwardation have impacted the total return on an investment in USO's shares during the past year relative to a hypothetical direct investment in crude oil and, in the future, it is likely that the relationship between the market price of USO's shares and changes in the spot prices of light, sweet crude oil will continue to be so impacted by contango and backwardation. (It is important to note that the disclosure above ignores the potential costs associated with physically owning and storing crude oil, which could be substantial.)

> * * *

> ***USCF believes that market arbitrage opportunities will cause the daily changes in USO's share price on the NYSE Arca to closely track the daily changes in USO's per share NAV. USCF further believes that the daily changes in USO's NAV in percentage terms will closely track the daily changes in percentage terms in the Benchmark Oil Futures Contract, less USO's expenses.***

> * * *

30

> ***USCF employs a "neutral" investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down***. USO's "neutral" investment strategy is designed to permit investors generally to purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-effective manner, and/or to permit participants in the oil or other industries to hedge the risk of losses in their crude oil-related transactions. Accordingly, depending on the investment objective of an individual investor, the risks generally associated with investing in crude oil and/or the risks involved in hedging may exist. In addition, an investment in USO involves the risk that the daily changes in the price of USO's shares, in percentage terms, will not accurately track the daily changes in the Benchmark Oil Futures Contract, in percentage terms, and that daily changes in the Benchmark Oil Futures Contract in percentage terms, will not closely correlate with daily changes in the spot prices of light, sweet crude oil, in percentage terms.

(Emphasis added.)

93.    Lastly, the March Registration Statement stated the following regarding the

Company's strategy in the event that the Company's oil investments decline in value:

> USO is not actively managed by conventional methods. Accordingly, ***if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract***. USCF will seek to cause the NAV of USO's shares to track the Benchmark Oil Futures Contract during periods in which its price is flat or declining as well as when the price is rising.

(Emphasis added.)

94.    The March Registration Statement was ultimately declared effective by the SEC on

March 23, 2020, and the Company sold over $2.4 billion worth of USO shares to investors.

95.    The statements referenced in ¶¶ 86–93 herein were materially false and misleading

and failed to disclose material facts necessary to make the statements made not false and

misleading. Specifically, the Defendants failed to disclose, *inter alia*, that: (1) The Company's oil

investments were being heavily impacted by the COVID-19 pandemic, an ongoing oil price war,

super contango, and issues with the Company's liquidity, among other things; (2) as a result, the

Company's risk profile had been radically altered, and the Company would no longer be able to achieve its stated objectives in the market or adhere to the investment strategy Defendants had touted to investors; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Gradually Emerges**

*April 16, 2020 Form 8-K*

96.     On April 16, 2020, the Company filed a current report on Form 8-K with the SEC announcing that the Company would be altering the investment strategy disclosed in the March Registration Statement, due to "market conditions and regulatory requirements." The Form 8-K stated the following, in relevant part:

> United States Oil Fund, LP ("USO"), a Delaware limited partnership, currently invests in crude oil futures contracts on the NYMEX and ICE Futures in the near month contract to expire (or "front month"), except when the near month contract is within two weeks of expiration, in which case it invests in the futures contract that is the next month contract to expire (the "second month"***). Because of market conditions and regulatory requirements, USO will continue to invest in these front month contracts but will also invest in other permitted investments, as described below and in its prospectus***. USO's portfolio holdings as of the end of the prior business day are posted each day on the website: www.uscfinvestments.com.
>
> As stated in the prospectus for USO, USO seeks to achieve its investment objective by investing primarily in futures contracts for light, sweet crude oil, other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels that are traded on the NYMEX, ICE Futures Europe and ICE Futures U.S. (together, "ICE Futures") or other U.S. and foreign exchanges (collectively, "Oil Futures Contracts") and to a lesser extent, in order to comply with regulatory requirements or in view of market conditions, other oil-related investments such as cash-settled options on Oil Futures Contracts, forward contracts for oil, cleared swap contracts and non-exchange traded ("over-the-counter" or "OTC") transactions that are based on the price of oil, other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing (collectively, "Other Oil Related Investments"). Market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to

execute transactions with more favorable pricing. (For convenience and unless otherwise specified, Oil Futures Contracts and Other Oil-Related Investments collectively are referred to as "Oil Interests" in the prospectus.)

***Commencing on April 17, 2020, and until further notice and market conditions and regulatory conditions permit otherwise, USO intends to invest approximately 80% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the front month contract and approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the second month contract***, except when the front month contract is within two weeks of expiration, in which case the futures contracts held by USO will be rolled into the second month contract and third month contract. Any investments by USO in crude oil futures contracts will be subject to any applicable limits on such futures contracts as may be imposed by the NYMEX and ICE Futures. ***The foregoing may impact the performance of USO. In addition, as a result of these changes, USO may not be able to meet its investment objective***, which is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses.

(Emphasis added.)

### *April 20, 2020 Form 8-K*

97.    On April 20, 2020, the Company filed a current Report on Form 8-K with the SEC disclosing, among other things, that the Company was running out of shares it could sell to the market. As such, the Company may have to suspend the creation of new shares of Company stock, which could have the effect of creating "a significant variation between the market price at which shares are traded and the shares' net asset value."

98.    That day, as the market began to acclimate to the possibility that the price of the oil delivered to Cushing, Oklahoma could fall below the cost of storing the oil, the May 2020 WTI crude oil contracts closed at a negative price.

### *April 20, 2020 Registration Statement*

99.    Also on April 20, 2020, the Company filed a registration statement on Form S-3 with the SEC in connection with the planned sale of additional shares of Company stock to the

market (the "April Registration Statement.") The April Registration Statement disclosed a wealth

of new information to the public concerning the impact of the COVID-19 pandemic on the

Company's oil investments, which the Defendants had failed to disclose in the March Registration

Statement. The April Registration Statement stated the following, in relevant part:

> An outbreak of infectious respiratory illness caused by a novel coronavirus known
> as COVID-19 was first detected in China in December 2019 and has now been
> detected globally. In March 2020, the World Health Organization declared the
> COVID-19 outbreak a pandemic. COVID-19 has resulted in numerous deaths,
> travel restrictions, closed international borders, enhanced health screenings at ports
> of entry and elsewhere, disruption of and delays in healthcare service preparation
> and delivery, prolonged quarantines and the imposition of both local and more
> widespread "work from home" measures, cancellations, supply chain disruptions,
> and lower consumer demand, as well as general concern and uncertainty. ***The
> ongoing spread of COVID-19 has had, and is expected to continue to have, a
> material adverse impact on local economies in the affected jurisdictions and also
> on the global economy, as cross border commercial activity and market sentiment
> are increasingly impacted by the outbreak and government and other measures
> seeking to contain its spread. The impact of COVID-19, and other infectious
> illness outbreaks that may arise in the future, could adversely affect individual
> issuers and capital markets in ways that cannot necessarily be foreseen. In
> addition, actions taken by government and quasi-governmental authorities and
> regulators throughout the world in response to the COVID-19 outbreak,
> including significant fiscal and monetary policy changes, may affect the value,
> volatility, pricing and liquidity of some investments or other assets, including
> those held by or invested in by USO. Public health crises caused by the COVID-
> 19 outbreak may exacerbate other pre-existing political, social and economic
> risks in certain countries or globally. The duration of the COVID-19 outbreak
> and its ultimate impact on USO and, on the global economy, cannot be
> determined with certainty. The COVID-19 pandemic and its effects may last for
> an extended period of time, and could result in significant and continued market
> volatility, exchange trading suspensions and closures, declines in global
> financial markets, higher default rates, and a substantial economic downturn or
> recession. The foregoing could impair the USO's ability to maintain operational
> standards (such as with respect to satisfying redemption requests), disrupt the
> operations of USO's service providers, adversely affect the value and liquidity of
> USO's investments, and negatively impact the USO's performance and your
> investment in USO. The extent to which COVID-19 will affect USO and USO's
> service providers and portfolio investments will depend on future developments,
> which are highly uncertain and cannot be predicted, including new information
> that may emerge concerning the severity of COVID-19 and the actions taken to
> contain COVID-19. Given the significant economic and financial market***

*disruptions associated with the COVID-19 pandemic, the valuation and performance of the USO's investments could be impacted adversely*.

(Emphasis added.)

100.    The April Registration Statement further indicated that the Company had experienced a monthly drawdown of 54.7% in March 2020—the worst monthly drawdown in the Company's history—and revealed that "[g]iven market volatility in 2020 arising from the COVID-19 pandemic and other geopolitical issues, USO believes it is reasonable to assume that it will not earn any significant interest income in 2020."

*April 21, 2020 Form 8-K*

101.    On April 21, 2020, the Company filed a current report on Form 8-K with the SEC revealing that the Company had been unable to invest in line with the revised strategy the Company had previously announced on April 16, 2020, stating the following, in relevant part:

> United States Oil Fund, LP ("USO"), a Delaware limited partnership, announced previously in a Form 8-K filed on April 17, 2020 that commencing on April 17, 2020 and until further notice and market conditions and regulatory conditions permit otherwise, USO would invest approximately 80% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the front month contract and approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the second month contract, except when the front month contract is within two weeks of expiration, in which case the futures contracts held by USO will be rolled into the second month contract and third month contract.
>
> *Commencing on April 21, 2020, because of extraordinary market conditions in the crude oil markets, including super contango, USO has invested in other permitted investments, as described below and in its prospectus. In particular, on April 21, 2020, USO invested in approximately 40% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the June contract, approximately 55% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the July contract and approximately 5% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the August contract*, except when the front month contract is within two weeks of expiration, in which case the futures contracts held by USO will be rolled into the July contract, August contract and September contract. In addition, commencing on April 22, 2020, USO in response to ongoing extraordinary market conditions in the crude oil

markets, including super contango, may invest in the above described crude oil futures contracts on the NYMEX and ICE Futures in any month available or in varying percentages or invest in any other of the permitted investments described below and in its prospectus, without further disclosure. USO intends to attempt to continue tracking USO's benchmark as closely as possible, however significant tracking deviations may occur above and beyond the differences described herein. USO's portfolio holdings as of the end of the prior business day are posted each day on the website: www.uscfinvestments.com/uso.

(Emphasis added.)

102.    Also on April 21, 2020, the Company disclosed that the SEC had not declared the April Registration Statement Effective, and that the Company had issued all of its remaining registered shares of Company stock to the market.

### April 22, 2020 Form 8-K

103.    On April 22, 2020, the Company filed a current report on Form 8-K with the SEC announcing that the Company had again altered its investment strategy, acknowledging "ongoing extraordinary market conditions in the crude oil markets, including 'super contango.'" The Form 8-K stated the following, in relevant part:

> *As of April 22, 2020, in response to ongoing extraordinary market conditions in the crude oil markets, including "super contango" (a higher level of contango arising from the overabundance of oil being produced and the limited availability of storage for such excess supply), USO may invest approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the June futures contract, approximately 50% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the July contract, approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the August contract, and approximately 10% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the September contract.* The foregoing announcement of USO's intended investments is not meant to limit its ability to invest in other investments as permitted in USO's prospectus. Accordingly, in response to ongoing extraordinary market conditions in the crude oil markets, including super contango, USO may invest in the above described crude oil futures contracts on the NYMEX and ICE Futures in any month available or in varying percentages or invest in any other of the permitted investments described below and in its prospectus, without further disclosure. USO intends to attempt to continue tracking USO's benchmark as closely as possible, however significant tracking deviations may occur above and beyond the differences

described herein. USO's portfolio holdings as of the end of the prior business day are posted each day on the website: www.uscfinvestments.com/uso.

(Emphasis added.)

104.     That same day, the Company announced that it would enact a 1-to-8 reverse stock split of its common stock, effective after the close of trading on April 28, 2020.

### April 24, 2020 Form 8-K

105.     On April 24, 2020, the Company filed a current report on Form 8-K with the SEC disclosing yet more alterations to the Company's planned investments in monthly WTI futures contracts as follows:

> Previously, as of April 22, 2020, in response to ongoing extraordinary market conditions in the crude oil markets, including "super contango" (a higher level of contango arising from the overabundance of oil being produced and the limited availability of storage for such excess supply) and regulatory requirements, USO announced that it may invest approximately 20% of its portfolio in crude oil futures contracts on the New York Mercantile Exchange (the "NYMEX") and ICE Futures Europe and ICE Futures U.S. (together, "ICE Futures") in the June futures contract, approximately 50% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the July contract, approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the August contract, and approximately 10% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the September contract.

> As of April 24, 2020, and for the reasons discussed below, USO may invest approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the June futures contract, approximately 40% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the July contract, approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the August contract, and approximately 20% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the September contract.

### April 27, 2020 Form 8-K

106.     On April 27, 2020, the Company filed a current report on Form 8-K with the SEC disclosing, once again, further alterations to the Company's investments in monthly WTI futures contracts, stating the following, in relevant part:

United States Oil Fund, LP ("USO"), a Delaware limited partnership, announced previously in Forms 8-K filed on April 16, 2020 (previously reported as having been filed on April 17, 2020), April 21, 2020, April 22, 2020 and April 24, 2020, (together, the "Prior April Forms 8-K"), that USO intended to invest in other permitted investments beyond the Benchmark Oil Futures Contract, as described below and in its prospectus. In the Prior April Forms 8-K, USO also announced the particular investments and percentages of such investments in which USO intended to invest. This Form 8-K updates USO's previously announced intention with respect to the particular permitted investments and percentages of such investments in which USO intends to invest. This Form 8-K also provides notice that due to regulatory requirements, current market conditions and risk mitigation measures imposed by USO's futures commission merchant ("FCM") as described below, United States Commodity Funds, LLC ("USCF"), the general partner of USO, has determined that commencing with the monthly roll occurring in May 2020, USO's positions in Oil Futures Contracts and Other Oil Related Investments will roll over a ten-day period commencing on May 1, 2020. Capitalized terms that are used but not defined in this Form 8-K have the meaning given to them in USO's prospectus.

* * *

Commencing on April 27, 2020 and through April 30, 2020, for the reasons set forth below and, in particular because of evolving market conditions, regulator accountability levels and position limits being imposed on USO with respect to the Oil Futures Contracts, and risk mitigation measures taken by its FCM with respect to USO acquiring additional Oil Futures contracts, USO has determined that it will invest in Oil Futures Contracts as follows: approximately 30% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the July contract, approximately 15% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the August contract, and approximately 15% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the September contract, and approximately 15% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the October contract, and approximately 15% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the December contract, and approximately 10% of its portfolio in crude oil futures contracts on the NYMEX and ICE Futures in the June 2021 contract. USCF will roll the current portfolio positions into the positions described above over a three-day period with approximately 33.3% of the investment changes taking place each day on each of April 27, 2020, April 28, 2020, and April 29, 2020. USO's portfolio holdings as of the end of the prior business day are posted each day on the website at *www.uscfinvestments.com.*

### April 27, 2020 Form S-3/A

107.    Also on April 27, 2020, the Company filed an amendment on Form S-3/A to the

April Registration Statement with the SEC, which revealed previously undisclosed information

regarding the impact of the Russia-Saudi Arabia oil price war and the Company's liquidity issues,

stating the following:

> Historically, USO has achieved its investment objective primarily by investing in the Benchmark Futures Contract and in oil futures contracts for light, sweet crude oil traded on NYMEX and ICE Futures with the same maturity month as the Benchmark Futures Contract. However, the possibility of conditions, including market and regulatory conditions, occurring that would cause USO to invest in other permissible investments is not without precedent. In 2020, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, significant market volatility occurred and is continuing in the crude oil markets as well as the oil futures markets. ***As a result of market and regulatory conditions, including significant market volatility, large numbers of USO shares purchased during a short period of time, regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO announced its intent to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract and that it could, if it determined it appropriate in light of market conditions and regulatory requirements, invest in Other Oil-Related Interests. Investments intended to meet USO's investment objective, other than investments in the Benchmark Futures Contract, may impact the performance of USO and can make it difficult for USO to track the Benchmark Futures Contract or meet its investment objective***.
>
> Certain circumstances, including the need to comply with regulatory requirements (including, but not limited to, exchange accountability and position limits) ***and market conditions (including but not limited to those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing) as well as risk mitigation measures imposed 1 44574564.1 by USO's futures commission merchant that further limit USO and other market participants from investing in crude oil futures contracts in certain months, could and have caused USO to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract***. Currently, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, significant market volatility occurred in the oil futures markets. In addition, the exchange where the Benchmark Oil Futures Contract is traded became concerned about positions that USO had acquired in that contract and imposed limits on USO's holding of that contract, as well as subsequent months of that contract.

(Emphasis added.)

      108.    The Form S-3/A further disclosed that the Company was at serious risk of failing

to fulfill its investment objectives due to the foregoing developments, stating the following:

In 2020, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, significant market volatility occurred and is continuing in the crude oil markets as well as the oil futures markets. ***As a result of market and regulatory conditions, including significant market volatility, large numbers of USO shares purchased during a short period of time, and applicable regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO invested in Oil Futures Contracts in months other than the Benchmark Oil Futures Contracts. The foregoing impacted the performance of USO and made it difficult for USO to track the Benchmark Futures Contract or meet its investment objective***, which is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses.

USO intends to attempt to continue tracking the Benchmark Futures Contract as closely as possible, however, ***in the current market and regulatory environment, significant tracking deviations can be anticipated to occur above and beyond the differences that historically occurred when the primary investment was the Benchmark Futures Contract and light sweet crude oil futures contracts of the same month traded on ICE Futures. In addition, the types of permitted investments that USO invests in as a result of regulatory requirements and limits imposed by its futures commission merchants in trying to approximate its investment objective such as later months in the Oil Futures Contracts than the tenor of the Benchmark Futures Contract are likely, and will likely continue, to experience greater effects from contango***. While it is USO's expectation that at some point in the future it will return to investing in the Benchmark Futures Contract and related ICE Futures contracts or other similar futures contracts of the same tenor based on light, sweet crude oil, there can be no guarantee of when, if ever, that will occur. As a result, investors in USO should expect that there will be continued deviations between the performance of USO's investments and the Benchmark Futures Contract and that USO may not be able to track the Benchmark Futures Contract or meet its investment objective.

(Emphasis added.)

### April 28, 2020 Form 8-K

109.    Finally, on April 28, 2020, the Company filed a current report on Form 8-K containing the Company's account statement for March 2020. The monthly account statement revealed that the Company had suffered approximately $1.2 billion in losses during March 2020.

110.    On this news, the price of the Company's stock fell from $2.19 per share at the close of trading on April 27, 2020, to $2.13 per share at the close of trading on April 28, 2020, adjusted for the Company's April 28, 2020 stock split.

111.    In total, the price of the Company's stock declined by approximately 80% during the Relevant Period, sinking from $10.40 per share at the close of trading on February 25, 2020, to $2.13 per share at the close of trading on April 28, 2020, adjusted for the April 28, 2020 reverse stock split.

**Subsequent Developments**

112.    On April 30, 2020, the Company filed a current report on Form 8-K with the SEC announcing further changes to its investment strategy, and indicating that the Company was likely to continue making subsequent alterations to its strategy in the future. The Form 8-K stated the following, in relevant part:

> As previously disclosed, various factors including, but not limited to, evolving market conditions, changes to regulatory requirements imposed on USO with respect to its investment in the Benchmark Oil Futures Contract or other Oil Futures Contracts, and risk mitigation measures imposed by FCMs on USO and other market participants, have severely limited USO's ability to invest in the Benchmark Oil Futures Contract and certain of the other investments in which USO traditionally would have invested in a substantial portion of its portfolio. Moreover, because such factors have continued to evolve, USO has had to invest in other permitted investments instead of investing primarily in the Benchmark Oil Futures Contract and the cash-settled, but substantially similar, oil futures contract traded on ICE Futures (the "ICE WTI Contract"), but also has had to more frequently change the holdings in its portfolio than it has in the past. ***The foregoing factors have changed USO's portfolio holdings and have resulted in significant deviations from USO's intended investment objective*** which is for the daily percentage changes in the net asset value ("NAV") per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses.
>
> At this time, ***it is likely that the factors limiting USO's investments in the Benchmark Oil Futures Contract will continue, including as a result of the***

> *COVID-19 pandemic and the state of the oil markets, and that USO's need to invest in other permitted investments will continue.*

(Emphasis added.)

113.    Then, on May 6, 2020, the Company filed another amendment on Form S-3/A to the April Registration Statement with the SEC, which revealed that the catastrophic market trends that the Defendants had failed to disclose in the March 2020 Registration Statement had already been impacting the Company at the time the March 2020 Registration Statement was filed, stating the following:

> *As a result of previously discussed market conditions and the regulatory response that occurred in March and April of 2020*, large numbers of USO shares that were purchased during a short period of time, and regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO invested in Oil Futures Contracts in months other than the Benchmark Oil Futures Contracts. The foregoing impacted the performance of USO and made it difficult for USO to meet its investment objective, which is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses.

> \* \* \*

> *In March 2020, contango dramatically increased and reached historic levels during the economic crisis arising from the COVID-19 pandemic and disputes among oil producing nations regarding limits on oil production levels* This contango was due to significant market volatility that has occurred and is continuing in the crude oil markets as well as the oil futures markets. Crude oil prices have collapsed in the wake of the COVID-19 demand shock, which reduced global petroleum consumption, and the price war launched by Saudi Arabia at the beginning of March 2020 in response to Russia's unwillingness to participate in extending previously agreed upon supply cuts. An estimated twenty million barrels a day of crude demand evaporated as a result of quarantines and massive drops in industrial and manufacturing activity. In addition, the United States, OPEC, Russia, and other oil producers around the world agreed to a historic 9.7 million barrel per day cut to crude supply. In the short term, this cut does not close the gap relative to the massive drop in demand. However, the duration of the agreement, lasting until 2022, should allow oil prices to slowly recover as demand re-materializes. The supply cut should also reduce at least some of the unprecedented volatility oil markets experienced in March. As the crisis continues into the second quarter of

2020, and potentially beyond, demand weakness and limited storage capacity will
continue to put pressure on crude oil in the near term.

(Emphasis added.)

114.    On May 27, 2020, the Company filed a current report on Form 8-K containing the

Company's account statement for April 2020. The monthly account statement revealed that the

Company had suffered over $2.6 billion in losses during April 2020.

115.    Then, on May 29, 2020, Bloomberg published an article revealing that both the

SEC and the Commodity Futures Trading Commission had opened investigations into the

Company in connection with the Company's disclosures to investors and the Company's repeated

changes to its investment strategy during April 2020.[1] The article stated the following, in relevant

part:

> A popular exchange traded fund that uses complex derivatives to track oil is being
> investigated by U.S. regulators over whether its risks were properly disclosed to
> investors, scrutiny triggered by crude's historic slump during the coronavirus crisis,
> said three people familiar with the matter.
>
> The Securities and Exchange Commission and the Commodity Futures Trading
> Commission have both opened probes into the $4.64 billion United States Oil Fund,
> said the people who asked not to be named because the matter is private. The fund
> has lost 75% of its value this year.
>
> Issues the agencies are examining, the people said, include whether shareholders
> were adequately informed that the ETF's value wouldn't necessarily move in
> tandem with the spot price of oil and the fund's recent decision to purchase crude
> contracts that expire further out in the future. The change in contracts USO was
> buying deviated from its past investment strategy.

116.    Months later, on August 19, 2020, the Company filed a current report on Form 8-

K with the SEC revealing that on August 17, 2020, the Company, the General Partner, and

Defendant Love had received a Wells Notice—i.e., a preliminary determination by SEC staff that

---

[1]    https://www.bloomberg.com/news/articles/2020-05-29/uso-oil-etf-faces-u-s-probes-into-risk-disclosures-to-investors (last visited August 25, 2020).

the SEC should file an enforcement action against a company—relating to the SEC's investigation

into the Defendants' false and misleading statements. The Form 8-K stated the following, in

relevant part:

> On August 17, 2020, United States Commodity Fund LLC ("USCF"), United States Oil Fund LP ("USO"), and John Love received a "Wells Notice" (the "Wells Notice") from the staff of the U.S. Securities and Exchange Commission (the "SEC"). ***The Wells Notice relates to USO's disclosures in late April and early May regarding constraints imposed on USO's ability to invest in Oil Futures Contracts*** (as defined in the Prospectus). The Wells Notice states that ***the SEC staff has made a preliminary determination to recommend that the SEC file an enforcement action against USCF, USO, and Mr. Love alleging violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933, as amended, and Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder, in each case with respect to its disclosures and USO's actions during that period***.

(Emphasis added.)

117.    The same day, Reuters published an article on its website reporting on the

Company's receipt of the Wells Notice, stating the following, in relevant part:[2]

> (Reuters) - The U.S. Securities and Exchange Commission is considering enforcement action against United States Oil Fund LP, the largest crude oil exchange-traded fund, due to statements made after oil prices plunged into negative territory in April.

> * * *

> The notice, known as a Wells notice, says SEC staff have made a preliminary recommendation against USO, United States Commodity Fund LLC and its chief executive officer, John Love, saying it may have violated securities laws related to misstatements or fraud, according to the filing.

> The notice cites the fund's disclosures in late April and early May on the constraints imposed on its ability to invest in oil futures contracts. USO said in April it may not be able to meet its objective of reflecting the spot prices of oil, as it shifted funds out of near-term contracts in case oil futures slumped again.

## Repurchases

---

[2]   https://www.reuters.com/article/us-united-states-oil-fund-probe/united-states-oil-fund-gets-wells-notice-from-sec-idUSKCN25F1D5 (last visited August 25, 2020).

118. During the Relevant Period, the Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company repurchased approximately 10.7 million shares of its own common stock at artificially inflated prices.

119. According to the Company's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020, during March 2020, the Company purchased 3,275,000 shares of its common stock at an average price of $6.90 per share, adjusted for the Company's April 28, 2020 reverse stock split.

120. As the Company's stock was actually worth only $2.13 per share, the price at closing on April 28, 2020, the Company overpaid by approximately $15.6 million for repurchases of its own stock during March 2020.

121. According to the Company's quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2020, during April 2020, the Company purchased 7,437,500 shares of its common stock at an average price of $5.42 per share, adjusted for the Company's April 28, 2020 reverse stock split.

122. As the Company's stock was actually worth only $2.13 per share, the price at closing on April 28, 2020, the Company overpaid by approximately $24.4 million for repurchases of its own stock during June 2020.

123. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $40 million.

## DAMAGES TO USO

124. As a direct and proximate result of the General Partner and the Individual Defendants' conduct, USO will lose and expend many millions of dollars.

125.    Such losses include over $40 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

126.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, the General Partner, the General Partner's President and CEO, and the General Partner's CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127.    Additionally, these expenditures include, but are not limited to, any costs incurred in connection with the SEC and the Commodity Futures Trading Commission's investigations and potential enforcement actions against the Company.

128.    These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

129.    As a direct and proximate result of the General Partner and the Individual Defendants' conduct, USO has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations, and the General Partner and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

130.    Plaintiff brings this action derivatively and for the benefit of USO to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as general partner and as directors and/or officers of USO, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

131.    USO is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132.    Plaintiff is, and has been since before the beginning of the Relevant Period, a shareholder of USO. Plaintiff will adequately and fairly represent the interests of USO in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

133.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

134.    A pre-suit demand on the General Partner is futile and, therefore, excused. Demand is excused as to the General Partner because USCF faces a substantial likelihood of liability as a result of its knowing engagement in the scheme to cause the Company to make false and misleading statements and omissions of material fact to investors and the general public that falsely represented the Company's performance and value. USCF was the primary controller of the above-alleged scheme, and benefited at the expense of the Company, resulting in USCF being named as a defendant in the Securities Class Actions. As the General Partner breached its fiduciary duties to the Company, it faces a substantial likelihood of liability, and is not independent or disinterested, and thus demand on the General Partner is futile.

135.    Additionally, as the Company admitted in its 2019 10-K, the Company is subject to inherent conflicts of interest involving the General Partner and its officers and directors, which may cause them to favor their own interests to the detriment of the Company and its shareholders. The 2019 10-K stated the following:

> ***USO and USCF may have conflicts of interest, which may permit them to favor their own interests to the detriment of shareholders.***

> USO is subject to actual and potential inherent conflicts involving USCF, various commodity futures brokers and Authorized Participants. USCF's officers, directors and employees do not devote their time exclusively to USO and also are directors, officers or employees of other entities that may compete with USO for their services. They could have a conflict between their responsibilities to USO and to those other entities. As a result of these and other relationships, parties involved with USO have a financial incentive to act in a manner other than in the best interests of USO and the shareholders. USCF has not established any formal procedure to resolve conflicts of interest. Consequently, investors are dependent on the good faith of the respective parties subject to such conflicts of interest to resolve them equitably. Although USCF attempts to monitor these conflicts, it is extremely difficult, if not impossible, for USCF to ensure that these conflicts do not, in fact, result in adverse consequences to the shareholders.

(Emphasis in original.)

136.    As a result of the foregoing, the General Partner breached its fiduciary duties, faces a substantial likelihood of liability in this Action and in the Securities Class Actions, is not disinterested, and demand upon it is futile, and thus excused.

137.    Additional reasons that demand on the General Partner is futile follow.

138.    First, all the directors on the Board of the General Partner have fiduciary duties to the General Partner, and in controlling the General Partner, they would cause it not to consider a demand fairly because granting the demand would hurt the General Partner.

139.    Second, the majority of the Board of the General Partner is not independent or disinterested, as each of them either knowingly or recklessly participated in the conduct alleged herein, in complete abdication of their fiduciary duties to the Company, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the General Partner. At the time of filing of this action, the Board of the General Partner consisted of Defendants Love, Ngim, Ellis, Fobes, Gerber, Nguyen, and Robinson (the "Directors").

140.    Additional reasons that Defendant Love is not independent or disinterested follow. Defendant Love has served as USCF's President and CEO since May 2015, as a director of USCF

since October 2016, and as Chairman of the Board of USCF since October 2019. Thus, as the Company admits, he is a non-independent director. Defendant Love was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the March Registration Statement. As the General Partner's highest officer and as a trusted Director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Love is a defendant in the Securities Class Actions. For these reasons, Defendant Love breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

141.    Additional reasons that Defendant Ngim is not independent or disinterested follow. Defendant Ngim is a co-founder of USCF, and has served as the COO of USCF since August 2016, and as a director of USCF since May 2005. Thus, as the Company admits, he is a non-independent director. As the General Partner's COO, and as a trusted Director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ngim signed, and thus personally made the false and misleading statements in the March Registration Statement. For these reasons, Defendant Ngim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

142.    Additional reasons that Defendant Ellis is not independent or disinterested follow. Defendant Ellis has served as a director of USCF since September 2005. He also serves as a member of USCF's Audit Committee. Defendant Ellis has received and continues to receive compensation for his role as a Director as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ellis signed, and thus personally made the false and misleading statements in the March Registration Statement. For these reasons, Defendant Ellis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

143.    Additional reasons that Defendant Fobes is not independent or disinterested follow. Defendant Fobes has served as a director of USCF since September 2005. He also serves as the Chair of USCF's Audit Committee. Defendant Fobes has received and continues to receive compensation for his role as a Director as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fobes signed, and thus personally made the false and misleading statements in the March Registration Statement. For these reasons, Defendant Fobes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

144.     Additional reasons that Defendant Gerber is not independent or disinterested follow. Defendant Gerber is a co-founder of USCF, and has served as a director of USCF since June 2005, and as a vice president of USCF since May 2015. Thus, as the Company admits, he is a non-independent director. As a trusted Director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gerber signed, and thus personally made the false and misleading statements in the March Registration Statement. For these reasons, Defendant Gerber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

145.     Additional reasons that Defendant Nguyen is not independent or disinterested follow. Defendant Nguyen is a co-founder of USCF, and has served as a director of USCF since July 2015. Indeed, the Company admits that he is a non-independent director. As a trusted Director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Nguyen signed, and thus personally made the false and misleading statements in the March Registration Statement. For these reasons, Defendant Nguyen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

146.     Additional reasons that Defendant Robinson is not independent or disinterested follow. Defendant Robinson has served as a director of USCF since September 2005. He also

serves as a member of USCF's Audit Committee. Defendant Robinson has received and continues to receive compensation for his role as a Director as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Robinson signed, and thus personally made the false and misleading statements in the March Registration Statement. For these reasons, Defendant Robinson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

147.    Additional reasons that the Directors are not independent or disinterested follow.

148.    Each of the Directors, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

149.    Defendants Ellis, Fobes, and Robinson (the "Audit Committee Defendants") served on USCF's Audit Committee during the Relevant Period. Pursuant to USCF's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's financial reporting process, the integrity of the Company's financial statements, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit

Committee Charter, allowing the Company to issue false and misleading statements and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and thus would not cause the General Partner to consider a demand fairly.

150.    The Directors, who control the General Partner, have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently. In fact, six of the Directors have served on the General Partner's Board for over a decade, and have served in various positions at Wainwright Holdings, Inc. ("Wainwright"), the sole member of the General Partner. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the General Partner and the Individual Defendants' conduct.

151.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, are beholden to and controlled by Defendant Gerber, who is a majority shareholder of Concierge Technologies, Inc., the sole shareholder of Wainwright, which is in turn the sole member of the General Partner. According to the Company's 2019 10-K, any Director may be removed from the General Partner's Board by written consent of Wainwright, and thus, as the Company concedes, "it is possible for Mr. Gerber to exercise his indirect control of Wainwright to effect the removal of any Director." Defendant Gerber therefore has significant control over the continued employment of the Directors, especially Defendant Love, who is the CEO and President of USCF. Thus, the Directors would not cause the General Partner to evaluate a demand with disinterest or independence as a result of Defendant Gerber's control over them.

152.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Defendants' scheme to issue materially false and misleading statements to the public and to

facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability would not cause the General Partner to consider a demand fairly.

153. USO has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for USO any part of the damages USO suffered and will continue to suffer thereby. Thus, any demand upon the General Partner would be futile.

154. The Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's Limited Partnership Agreement (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to cause the General Partner to pursue this action on behalf of the unitholders of the Company.

155. The acts complained of herein constitute violations of fiduciary duties owed by the General Partner and its officers and directors, and these acts are incapable of ratification.

156. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to the shareholders of USO. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to cause the General Partner to sue themselves or certain of the officers of the General Partner, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to cause the General Partner to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the General Partner is futile and, therefore, excused.

157.    If there is no directors' and officers' liability insurance, then the Directors will not cause the General Partner to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

158.    Thus, for all of the reasons set forth above, the General Partner cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the General Partner is excused as futile.

## FIRST CLAIM

**Against Defendants for Violations of**
**Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    Defendants participated in a scheme to defraud with the purpose and effect of defrauding USO.  Not only is USO now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the

largest victims of the unlawful scheme perpetrated upon USO by the Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Defendants' misconduct, the Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging USO.

161.    During the Relevant Period, the Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

162.    Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about USO not misleading.

163.    USCF, as the general partner of the Company, and the Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as general partner and as directors and officers of the Company, the Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by USO.

164.    Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants

were the top executives of the Company and the General Partner, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

165.    By virtue of the foregoing, the Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

166.    Plaintiff on behalf of USO has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    Defendants, by virtue of their positions with USO and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of USO and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  Defendants had the power and influence and exercised the same to cause USO to engage in the illegal conduct and practices complained of herein.

169.    Plaintiff on behalf of USO has no adequate remedy at law.

## THIRD CLAIM

### Against Defendants for Breach of Fiduciary Duties

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    The Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of USO's business and affairs.

172.    The Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

173.    The Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of USO.

174.    In breach of their fiduciary duties owed to USO, the Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) The Company's oil investments were being heavily impacted by the COVID-19 pandemic, an ongoing oil price war, super contango, and issues with the Company's liquidity, among other things; (2) as a result, the Company's risk profile had been radically altered, and the Company would no longer be able to achieve its stated objectives in the market or adhere to the investment strategy Defendants had touted to investors; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

175.    The Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

176.    Also in breach of their fiduciary duties, the Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

177. In yet further breach of their fiduciary duties, during the Relevant Period, the Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

178. The Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of USO's securities.

179. The Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of USO's securities.

180. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

181. As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, USO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

182.     Plaintiff on behalf of USO has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants for Unjust Enrichment

183.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Defendants were unjustly enriched at the expense of, and to the detriment of, USO.

185.     The Defendants either benefitted financially from the improper conduct, or received profits, bonuses, stock options, or similar compensation from the General Partner that was tied to the performance or artificially inflated valuation of USO, or received compensation that was unjust in light of the Defendants' bad faith conduct.

186.     Plaintiff, as a shareholder and a representative of USO, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

187.     Plaintiff on behalf of USO has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants for Abuse of Control

188.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.     The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence USO, for which they are legally responsible.

190.     As a direct and proximate result of the Defendants' abuse of control, USO has sustained significant damages. As a direct and proximate result of the Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, USO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

191.     Plaintiff on behalf of USO has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants for Gross Mismanagement

192.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.     By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of USO in a manner consistent with the operations of a publicly-traded limited partnership.

194.     As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, USO has sustained and will continue to sustain significant damages.

195.     As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

196.     Plaintiff on behalf of USO has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants for Waste of Corporate Assets

197.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

199.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

200.    As a result of the waste of corporate assets, the Defendants are each liable to the Company.

201.    Plaintiff on behalf of USO has no adequate remedy at law.

## EIGTH CLAIM

### Against Defendants USCF, Love, and Crumbaugh for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    USO, along with Defendants USCF, Love, and Crumbaugh are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of law, the Company's liability will be in whole or in part due to Defendants USCF, Love, and Crumbaugh's willful and/or reckless violations of their obligations as USO's general partner and as officers and/or directors of the General Partner.

204.    Through their positions of control and authority as USO's general partner and as officers and/or directors of the General Partner, Defendants USCF, Love, and Crumbaugh were

able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

205.    As such, Defendants USCF, Love, and Crumbaugh are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

206.    Accordingly, the Company is entitled to receive all appropriate contribution or indemnification from Defendants USCF, Love, and Crumbaugh.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of USO, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Defendants have breached or aided and abetted the breach of their fiduciary duties to USO;

(c)    Determining and awarding to USO the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing USO and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect USO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Limited Partnership Agreement and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen USCF's Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of USO to nominate at least four candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)      Awarding USO restitution from Defendants, and each of them;

      (f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 27, 2020            Respectfully submitted,

                           **THE BROWN LAW FIRM, P.C.**

                           */s/ Timothy Brown*_____
                           Timothy Brown
                           240 Townsend Square
                           Oyster Bay, New York 11771
                           Telephone: (516) 922-5427
                           Facsimile: (516) 344-6206
                           Email: tbrown@thebrownlawfirm.net

## **VERIFICATION**

I, Michael Cantrell am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

8/23/2020

DocuSigned by:

*Michael Cantrell*

Michael Cantrell